UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-2867(DSD/JJG)

Fred E. Freeman and
Kimberly S. Freeman,

       Plaintiffs,

v.                                                  **ORDER**

Steven E. Niznik and
Auto Club Insurance Association,

       Defendants.

    James A. Johnson, Esq. and Johnson & Houlihan, 28 North Stevens Street, Rhinelander, WI 54501, and Philip L. Sieff, Esq. and Robins, Kaplan, Miller & Ciresi, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, counsel for plaintiffs.

    William F. Davern, Esq. and Cousineau, McGuire Chartered, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416, counsel for defendant Steven E. Niznik.

    Daniel E. Hintz, Esq., John R. Crawford, Esq. and Johnson & Lindberg, 7900 International Drive, Suite 960, Minneapolis, MN 55425, counsel for defendant Auto Club Insurance Association.

This matter is before the court upon defendant Auto Club Insurance Association's ("Auto Club") motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants Auto Club's motion and dismisses plaintiffs' bad faith claim without prejudice.

**BACKGROUND**

This action stems from personal injuries sustained by plaintiff Fred Freeman ("Freeman") in a snowmobile collision with defendant Steven Niznik ("Niznik"). On March 13, 2005, Niznik was snowmobiling on a two-way trail roughly twenty feet in width with his two sons - who were on separate snowmobiles - and his grandson - who was riding with Niznik.[1] Niznik's sons rode ahead of him. Freeman was on the same trail coming in the opposite direction. When Freeman passed Niznik's sons, they both signaled to him that Niznik was behind them. As Freeman approached Niznik, Niznik applied his brakes causing the back of his snowmobile to swing into Freeman's side of the trail, resulting in the collision.[2] Freeman, Niznik and Niznik's grandson were all injured.

The Michigan State Police report made on the day of the accident and supplemented on April 4, 2005, confirmed that Niznik moved into Freeman's path. The diagram on the police report, however, showed Niznik fish-tailing before moving into Freeman's path. Niznik's wife objected in the report to this depiction, stating that Niznik was in control until his braking caused the

---

[1] Niznik's snowmobile was only designed to carry one person.

[2] All of the reports done in the immediate aftermath of the accident indicate that the back of Niznik's snowmobile moved onto Freeman's side of the trail. Nevertheless, in depositions taken on July 12, 2007, both Niznik and his son dispute this. (Niznik Dep. at 29; Shawn Niznik Dep. at 21.)

2

rear of the snowmobile to come over.[3] The report also included comments from Greg Mominee ("Mominee"), who reported following Niznik for a short distance on the trail that day at seventy miles-per-hour before dropping back.  Mominee arrived on the scene shortly after the collision and indicated that Niznik stated "[i]t was all my fault, I locked up the brakes, I was out of control."[4] Auto Club received this report on September 20, 2005, when an independent adjuster hired by Auto Club, Jon Boldebuck ("Boldebuck"), faxed it to George Koch ("Koch"), Auto Club's liability adjuster.

Mundahl interviewed Niznik about the incident.  Mundahl's May 11, 2005, report to Auto Club based on this interview indicated that Niznik believed Freeman was going too fast.[5]  Nevertheless, Mundhal noted that this would be difficult to show and that "simply based on [Niznik's] version, it would certainly appear that the majority of the negligence rests with him."  (Def. Ex. C at 3.)

---

[3] On or around May 11, 2005, Niznik also told Dave Mundahl ("Mundahl"), an independent adjuster hired by Auto Club, that he was going to appeal the police report because the diagram wrongly depicted him fish-tailing.  (Def. Ex. C.)

[4] In his deposition, Niznik denied making this comment. (Niznik Dep. at 47.)

[5] In his deposition, Niznik estimated that Freeman was traveling upwards of seventy-five miles-per-hour. (Niznik Dep. at 33.)  Shawn Niznik, one of Niznik's sons, also testified in his deposition that when he passed Freeman, Freeman was traveling between sixty and seventy-five miles-per-hour, and gaining speed. (Shawn Niznik Dep. at 25.)

On July 13, 2005, Boldebuck reported to Koch that Freeman claimed he was traveling at approximately fifty miles-per-hour when the collision occurred. Boldebuck opined that he would be surprised if Freeman was not traveling faster, and that "if he had some speed on him, there could be some negligence assessed against him." Nevertheless, Boldebuck concluded that "[s]hort of having an engineer workup on this accident, it will be difficult to tell how fast the claimant was traveling." (Pl. Ex. 1 at 42.) After examining the photographs taken from the Michigan State Patrol, however, Boldebuck reported to Koch on October 12, 2005, that assuming the snowmobiles had not been moved, "it would appear [Freeman] had some speed on his behalf."[6]

As a result of the collision, Freeman suffered a broken arm and a permanent and irreversible brachial plexus injury that prevents him from raising and lowering his arm. On April 18, 2005, Freeman's attorney, James Johnson ("Johnson"), wrote to Auto Club requesting insurance information. The letter also stated that Johnson had "requested medical records and bills from all health care providers and will forward the records and bills to [Auto Club] when they become available." Further, it revoked "[a]ny and all medical authorizations or any authorizations or releases of any

---

[6] Shawn Niznik stated in his deposition that he and his brother moved Freeman's snowmobile to the side of the trail immediately after the accident. (Shawn Niznik Dep. at 27-28.) Nothing, however, suggests that Auto Club was aware of this until the deposition.

kind signed by [Freeman] and provided to [Auto Club]." (Def. Ex. A.) Koch responded on May 2, 2005, requesting "copies of all medical documentation relating to [Freeman's] injuries" and copies of records of "any medical treatment of any kind" that Freeman received prior to the incident. (Def. Ex. B.) On June 22, 2005, Johnson wrote to Koch about the extent of Freeman's injuries and noted that his medical bills to that date were $16,477. (Def. Ex. D.) Johnson, however, did not provide documentation of those expenses. On July 6, 2005, Johnson again wrote Koch with an "itemization of special damages" indicating that Freeman's medical bills exceeded $41,000. (Def. Ex. E.) Again, however, Johnson did not provide documentation of the expenses.[7]

In his July 13, 2005, report, Boldebuck noted that Freeman "sustained a significant injury to his left hand and arm,"[8] and as a result "has lost a significant amount of time at work." (Pl. Ex. 1 at 41.) Accordingly, Boldebuck concluded "[b]ased on the description of the injury, and [Freeman's] present wage loss and future wage loss, it appears this claim may have some significant

---

[7] Despite the lack of documentation, Auto Club's records reflect that on June 13, 2005, Koch recommended setting its own reserve on the policy at the $100,000 limit "based on the nature of injury and amount of bills indicated by [Freeman's attorney]." (Pl. Ex. 1 at 103.) Internal documents show that by August 29, 2005, Auto Club had set the reserve at the policy limit. (Pl. Ex. 1 at 97.)

[8] Boldebuck mistakenly believed that Auto Club had received Freeman's medical information.

5

values."[9]  (Id. at 43.)  Koch, however, had still not received medical documentation from Johnson and stated in a July 20, 2005, letter that he "look[ed] forward to receiving the previously requested medical information soon."  (Def. Ex. G.)

The next communication between Koch and Johnson was an October 28, 2005, letter from Johnson making a final demand for payment of Niznik's $100,000 policy limit in exchange for a discharge of Auto Club's contractual responsibility to Niznik.  The demand gave Koch ten days to respond.  On October 31, 2005, in an internal note, Koch stated that the photos from the Michigan State Police indicated that Freeman and Niznik were both going fast and that "there could easily be liab[ility] on both parties."  (Pl. Ex. 1 at 93.)  Without talking to Niznik, Koch refused Johnson's policy limits demand on November 4, 2005.  Specifically, Koch noted that "I am continuing my review of the full extent of the circumstances of this incident and will advise you when that review is completed."  (Def. Ex. K.)  There was no further communication between Freeman and Auto Club until Freeman's newly retained co-

---

[9] Freeman had been an electrician for over eleven years.  At the time of the accident his hourly wage was $52.25 and he received time-and-a-half for any work over forty hours a week and double-time for Sundays and holidays.  Freeman typically worked between forty-five and fifty hours a week.  Boldebuck noted that Freeman's annual wage loss alone, not accounting for overtime pay, would exceed the $100,000 policy limit.

6

counsel, Philip Sieff ("Sieff"), filed this suit on July 3, 2006, alleging actions for negligence against Niznik and bad faith against Auto Club.[10]

Auto Club hired attorney William Davern ("Davern") to respond to the lawsuit. Davern sent a letter to Sieff on September 13, 2006, asking for verification of injuries and damages and indicating a willingness to settle. Davern received verification from Sieff on November 13, 2006, and on behalf of Auto Club offered Niznik's $100,000 policy limit to settle all claims on November 21, 2006. Freeman rejected this offer, and on February 14, 2007, Auto Club made another offer that included $14,520 in accrued interest in addition to the $100,000 policy limit. Freeman again rejected the offer. On July 24, 2007, Auto Club filed for summary judgment on plaintiffs' bad faith claim

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

---

[10] Freeman's wife, Kimberly Freeman, was also named as a plaintiff. She alleged that Niznik's negligence caused her to render nursing services to Freeman and denied her of Freeman's "services, society, and companionship." (Compl. at 5.)

7

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id.

## II. Bad Faith Claim

Under Minnesota law,[11] an insurer owes its insured a fiduciary duty of good faith when considering a claimant's offer to settle within the insured's policy limits. See Kissoondath v. U.S. Fire Ins. Co., 620 N.W.2d 909, 916 (Minn. Ct. App. 2001) (citing Short v. Dairyland Ins. Co., 334 N.W.2d 384, 387 (Minn. 1983)). This requires the insurer to "view the situation as if there were no

---

[11] The parties agree that Minnesota law applies.

policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured." Short, N.W.2d at 387-88 (citing Cont'l Cas. Co. v. Reserve Ins. Co., 238 N.W.2d 862 (Minn. 1976)). An insurer violates this duty when the insured is clearly liable and the insurer's refusal "to settle within the policy limits is not made in good faith and is not based upon reasonable grounds to believe that the amount demanded is excessive." Id. at 388.

Plaintiffs have simultaneously asserted a negligence claim against the insured, Niznik, and a bad faith claim against the insurer, Auto Club. Under Minnesota law, there is no privity of contract between a third-party claimant and an insurer. Morris v. Am. Family Mut. Ins. Co., 386 N.W.2d 233, 237 (Minn. 1986). Thus, a third-party claimant "cannot sue an insurer directly for failure to pay a claim but must first obtain a judgment against the insured" and then take an assignment of the insured's bad faith claim against the insurer. Id. (citations omitted). Without a judgment against the insured, there is no injury and the insured has no bad faith claim to assign. See Boerger v. Am. Gen. Ins. Co., 100 N.W.2d 133, 135 (Minn. 1959) ("[T]here must be bad faith on the part of the insurer with resulting injury to the insured before there can be a cause of action against the insurer for the

excess over its undertaking.") (citations and quotations omitted); see also Lange v. Fid. & Cas. Co., 185 N.W.2d 881, 884 (Minn. 1971).

In this case, plaintiffs have failed to establish a bad faith cause of action against Auto Club. Niznik has suffered no injury because plaintiffs have not obtained a judgment against him. Thus, Niznik has no bad faith claim to assign. Therefore, as a matter of law, plaintiffs' bad faith claim against Auto Club is premature and summary judgment is appropriate.[12]

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Auto Club's motion for summary judgment [Doc. No. 26] is granted and plaintiffs' bad faith claim is dismissed without prejudice.

Dated:   October 10, 2007

                                              s/David S. Doty
                                              David S. Doty, Judge
                                              United States District Court

---

[12] The court recognizes that plaintiffs and Auto Club agree that the court should reach the merits of the bad faith claim. In effect, the parties are asking the court to issue an advisory opinion on a cause of action that has yet to accrue. It is well established, however, that the federal courts are not in the business of issuing advisory opinions. See, e.g., Flast v. Cohen, 392 U.S. 83, 95 (1968).